ROB BONTA
Attorney General of California
ANNADEL A. ALMENDRAS (SBN 192064)
Senior Assistant Attorney General
DEBORAH M. SMITH (SBN 208960)
Acting Senior Assistant Attorney General
(application forthcoming)
DENNIS L. BECK, JR. (SBN 179492)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
(application forthcoming)
REBECCA HUNTER (SBN 356311)
(application forthcoming)
Deputy Attorneys General
CALIFORNIA DEPARTMENT OF JUSTICE
 1300 I Street, Suite 125
 Sacramento, CA 95814
 Telephone:  (916) 210-7801
 Fax:  (916) 327-2319
 E-mail:  Dennis.Beck@doj.ca.gov

*Attorneys for Plaintiff
State of California*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **STATE OF CALIFORNIA,** | Case No. |
| *Plaintiff,* | |
| **v.** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE AND OTHER RELIEF** |
| **CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,** | **(Defense Production Act, 50 U.S.C. § 4501 et seq.; Administrative Procedure Act, 5 U.S.C. §§ 701–706; Violation of U.S. Constitution Separation of Powers and 10th Amendment; Declaratory Relief)** |
| *Defendants.* | |

## INTRODUCTION

1.     In a breathtaking power grab, the federal Executive Branch has asserted that, with the stroke of a Cabinet Secretary's pen on an order under the Defense Production Act, the federal government may preempt and supersede all state laws governing hazardous oil pipelines, and any order of a state or federal court, in an effort to extract as much petroleum as it can from the coastal waters off of California. This stunning usurpation of California's police powers, and the powers of the state and federal courts, should be struck down swiftly and certainly.

2.     Onshore oil pipelines that run along the Santa Barbara, California, coast and inland to Kern County, California, were shut down in 2015 following a catastrophic rupture that spilled over 120,000 gallons of oil onto Refugio State Beach and into the ocean. In recent years, the pipeline operator has made repairs to the pipeline and sought to restart the pipelines, which fall within the jurisdiction of at least eight state agencies with regulatory authority over the pipelines and related facilities, or whose property the pipelines cross. The subset of those agencies that must grant affirmative approval for the pipelines to restart have been carefully examining the pipeline operator's requests, consistent with the specific safety and legal requirements under their respective statutes. Some approvals have been granted conditionally, while some remain under review pending the pipeline operator's submission of additional information or completion of legally required steps.

3.     The pipeline operator was unhappy with the speed of those approvals, however—not because they were taking longer than other similarly complex and environmentally sensitive reviews, but because the pipeline operator was severely undercapitalized and desperate to begin generating revenue. Accordingly, the pipeline operator asked Defendant United States Secretary of Energy Chris Wright to order it to restart the pipelines under the Defense Production Act (DPA). Secretary Wright issued that order on March 13, 2026. *See* Secretarial Order

entitled *Pipeline Capacity Prioritization and Allocation Order* (the Wright Order). 91 Fed Reg. ___ (March 13, 2026). The pipeline operator then relied on the Wright Order, and a contemporaneous opinion from the U.S. Department of Justice's Office of Legal Counsel, to argue that any state laws or existing court orders standing in the way of restart could be ignored and set aside. The very next day, on March 14, 2026, the pipeline operator restarted pumping oil through pipelines despite an outstanding preliminary injunction in state court, despite not having necessary permits from either the state or the federal government for pipeline operation, despite still not having approval from several state agencies, and despite not having a current or valid easement to keep or utilize the segment of its pipeline crossing California state property.

4. By way of this action, the State of California seeks declaratory relief and a permanent injunctive relief under the United States Constitution and the Administrative Procedure Act (APA) and vacatur under the APA with respect to the Wright Order.

5. The Wright Order directs the pipeline operator to immediately "prioritize and allocate" transportation of hydrocarbon services, i.e., crude oil, produced at three offshore platforms in the outer continental shelf (OCS) known as the Santa Ynez Unit. The crude oil extracted from the Santa Ynez Unit is transported through an undersea pipeline (the Offshore Pipeline), into a production facility onshore where it is treated and separated into distinct petroleum products, and then enters a different intrastate onshore pipeline system and travels approximately 120 miles to an inland distribution station (Lines CA-324/325). The Wright Order also directs the pipeline operator to "immediately commence performance" under contracts for oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing facility, and Lines CA-324/325, and to prioritize contracts regarding such oil over other contracts the company may have.

6.     Defendant Secretary Wright claims that his order is authorized by the DPA. Defendants assert that Title I of the DPA "authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense" with respect to energy production. Defendants cite the *Declaring a National Energy Emergency* Executive Order (Executive Order 14156) and generally claim that greenlighting the oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing facility, and Lines CA-324/325 is "necessary and appropriate to promote the national defense," and "maximize[s] domestic energy supplies" where those supplies are "scarce."

7.     A legal opinion issued by the U.S. Department of Justice's Office of Legal Counsel 10 days before the Wright Order opined that an order signed by a Cabinet Secretary under the DPA fully preempts contrary state law, as well as existing contrary federal and state court orders. As a result, the Wright Order purports to authorize activity that is illegal or unauthorized under both state law, and federal law, and barred by existing court orders, by directing and compelling that lawless action from a privately owned oil company desperate for a shortcut to restarting its oil production from the OCS through Lines CA-324/325 that have been shut down since the disastrous 2015 oil spill. Nothing in the DPA authorizes this usurpation of a State's sovereign police powers or the authority of the courts to enforce their own orders, and the federal Executive Branch's self-serving legal opinion to the contrary lacks merit.

8.     The facts do not justify this overreach either. Restarting the flow of oil through Lines CA-324/325 does not fix any of these purported problems. Defendants' national defense and national energy emergency justifications are patently unreasoned. To the contrary, the offshore platforms have a maximum expected gross oil rate of 50,000 barrels per day, contributing a fraction of a percent to the domestic energy market. Although international conflict has driven up oil

Complaint for Declaratory and Injunctive Relief

prices globally by reducing oil exports from the Middle East, there is no actual *shortage* of crude oil in the United States; the incremental oil production the Wright Order directs would thus neither address a shortage (because there is none) nor lower the cost of crude oil in the United States (because this miniscule incremental production would not have an impact on the global price of oil). And even if there were any marginal benefit to the "national defense," it would be vastly outweighed by the environmental and safety risks, as well as the unlawful and unconstitutional displacement of the State's police powers and the intrusion upon the State's sovereign property rights.

9.    Indeed, without this Court's intervention, the Wright Order would permit the federal government to order and authorize the restart of unpermitted and noncompliant infrastructure for oil and gas production and transportation in the State of California. Defendants improperly use the DPA to authorize sweeping preemption of state and federal regulatory frameworks governing oil and gas production and transportation, coastal management, environmental protections, property interests, and more. Such broad preemption is patently unauthorized by the DPA, and the Wright Order amounts to an unprecedented and historic grant of power to an oil corporation. If allowed to stand, the Wright Order would displace California's broad and comprehensive state environmental, pipeline safety, coastal management, and common law frameworks. Unlawfully bypassing any and all state requirements is an affront to the sovereignty of California and its right to exercise its police powers within its own borders.

10.   Not only does the Wright Order seek to preempt California law, but it also seeks to authorize the pipeline operator to directly violate two separate court orders—one from a state superior court and one from another federal court—requiring the operator to meet certain conditions before it can restart operating the pipelines. This violation of the Constitutional separation of powers between the Executive and Judicial branches is yet another attempt by the current federal

4                    Complaint for Declaratory and Injunctive Relief

administration to undermine the rule of law and to eviscerate a co-equal branch of the federal government.

11. To prevent these harms to Plaintiff, this Court should declare that the Wright Order is unlawful under the APA and violates the United States Constitution. For these and other reasons discussed below, the Wright Order should be declared unlawful and vacated.

## JURISDICTION AND VENUE

12. This action arises under the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Defense Production Act, 50 U.S.C. §§ 4501 et. seq.; and federal regulations implementing the Defense Production Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

13. Venue is proper in this district pursuant to 28 U.S. § 1391(b)(3).

## PARTIES

### Plaintiff

14. Plaintiff the State of California is a sovereign State of the United States. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11. The State of California administers its laws through various Executive Branch agencies and independent commissions of the State, including the Department of Forestry and Fire Protection's Office of the State Fire Marshal, the Department of Conservation's Geologic Energy Management Division, the California Coastal Commission, the State Lands Commission, the Department of Parks and Recreation, the State and Regional Water Resources Control Boards, the Department of Fish and Wildlife and that department's Office of Spill Prevention and Response.

Complaint for Declaratory and Injunctive Relief

**Defendants**

15.    Defendant Chris Wright is the Secretary of the United States Department of Energy (DOE), and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. § 7131.

16.    Defendant United States Department of Energy is a cabinet agency within the Executive Branch of the United States government. 42 U.S.C. § 7131.

**ALLEGATIONS**

**I. Congress Enacted the DPA to Respond to Legitimate Needs for Goods and Services in Times of Emergency**

17.    Congress enacted the DPA, 50 U.S.C. §§ 4501 *et seq.*, to provide the President, and Executive Branch officials by delegation, with authority to shape military preparedness and provide necessary industrial supplies for the national defense.

18.    The DPA authorizes the Executive to employ three tools to carry out its purpose. Title I of the DPA provides for the "allocation and prioritization" of government contracts for strategic and critical goods. Title II allows the Executive to utilize financial incentives to expand capacity. Title VII authorizes the Executive to enter into voluntary agreements with private industry. (Other titles of the DPA have since expired and are no longer in effect.)[1]

19.    The cornerstone provision of the DPA is Title I, which authorizes the President to require industry to prioritize and give preference to federal contracts or orders and to allocate materials, services and facilities which he deems necessary for national defense.[2] Additionally, the President may "allocate materials, services,

---

[1] 50 U.S.C. §§ 4501 et seq.
[2] 50 U.S.C. § 4511.

and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."[3]

20.  "National defense" is broadly defined to encompass "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity," as well as "emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act and critical infrastructure protection and restoration."[4]

21.  Historically, the DPA has primarily been invoked for military contracts for goods and services and to react to a global crisis, such as the COVID-19 pandemic. The Executive has used the DPA to direct industry to prioritize the fulfillment of government contracts for specific goods it deemed critical and strategic, such as meat production[5] and medical supplies in response to COVID-19, and for the Department of Defense to "allocate" civilian aircraft for potential use by the government during a national defense emergency.[6]

22.  The DPA confers a distinct grant of authority specifically directed at contracts and allocation orders for energy production. It provides that "[n]otwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies" upon making certain statutory findings.[7] Critically, this authority may not be invoked unless the President finds that the relevant materials, services, and facilities are "scarce, critical, and essential" to maintaining or

---

[3] 50 U.S.C. § 4511(a)(2).
[4] 50 U.S.C. § 4552 (14).
[5] Exec. Order No. 13917, 85 Fed. Reg. 26,313, 26,313 (Apr. 28, 2020).
[6] The allocation authority supports the Civil Reserve Air Fleet (CRAF) program, which was created initially in 1951, and is now managed by the U.S. Department of Transportation. https://www.congress.gov/crs-product/R43767#fn23
[7] 50 U.S.C. § 4511(c)(1).

7              Complaint for Declaratory and Injunctive Relief

expanding energy exploration, production, refining, or transportation, and that these objectives "cannot reasonably be accomplished without exercising" this authority.[8] These are required threshold findings of fact, not merely discretionary recitals.

23. The DPA contains no provision indicating that it displaces judicial power or state power preserved by Congress in other statutes, coastal management, environmental protections, property interests, and more.

24. Finally, the DPA contains a sunset provision that requires Congress to periodically reauthorize it to retain effect. Notably, in 2009, Congress did not reauthorize the provision that allowed the President to use the DPA to requisition private property.

**II. Faulty Maintenance of Line CA-324 Resulted in One of the Largest Oil Spills in California History and Extensive Damage to the State, and its Unlawful Restart by an Irresponsible Company is a Dangerous Usurpation of California's Police Powers.**

25. The Wright Order directs a pipeline operator, Sable Offshore Corporation (Sable), to restart production and transportation of oil and gas through pipelines that were shut down since a devastating oil spill in 2015. By way of background, the Wright Order pertains to several processes and pieces of infrastructure. Crude oil and other hazardous liquids are produced at three offshore drilling platforms off the Santa Barbara Coast (the Santa Ynez Unit) and transported by undersea pipelines to a processing facility immediately onshore, called the Las Flores Canyon Processing Facility. There, the liquids and natural gas are separated and treated, and the processed oil product is then placed into different Lines CA-324/325 that span more than 120 miles from the Santa Barbara County coast inland to Kern County, California, for storage and ultimately distribution. The Santa Ynez Unit, the Las Flores Canyon Processing Facility, and the Offshore and Lines CA-324/325 came online between 1970 and the mid-1990s.

---

[8] 50 U.S.C. § 4511(c)(2).



26.   On May 19, 2015, Line CA-324 (then known as Line 901) ruptured, releasing over 120,000 gallons of heavy crude oil into the environment along the Santa Barbara coast at Refugio State Beach, which came to be known as the Refugio Oil Spill. The spill coated seven miles of shoreline with crude oil and tar balls and damaged beaches more than 100 miles down the coast.

27.   Investigations determined that Lines CA-324/325's system designed to prevent corrosion used a defective design that could not be remediated. The investigation report determined that the cause of the rupture was external corrosion of the pipeline wall at the point of failure.

28.   The Refugio Oil Spill caused widespread damage to California's natural resources, lands, and livelihoods. The spill oiled the Pacific Ocean and the coastal zone from Refugio Beach to as far south as Manhattan Beach in Los Angeles County.

29. The spill adversely impacted natural resources under the trusteeship of the State of California, including marine mammals and fish, kelp and eelgrass, and it degraded marine and coastal habitats. It harmed migratory marine mammals and birds that spend a portion of their lifecycle within the waters of the Channel Islands National Marine Sanctuary. The California Department of Fish and Wildlife had to close commercial and recreational fishing. The spill also impeded shoreline and offshore recreation and boating at Channel Islands National Park and marred and closed Santa Barbara's beaches to public use and enjoyment.

30. Lines CA-324/325 were taken out of operation after the spill, and state and federal regulators, as mentioned, investigated the failure. Around that time, in 2016, the Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that Lines CA-324/325 were *intra*state pipelines, and that the State of California had authority to regulate and impose safety standards pursuant to the Pipeline Safety Act.[9] In 2016, regulatory authority over the Pipelines was then transferred from PHMSA to the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM).

31. On May 12, 2020, the United States, California state regulatory agencies, and the University of California filed a civil action against then-owner and operator, Plains All American Pipeline Company (Plains), for causing the Refugio Oil Spill. *U.S. v. Plains All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020).

32. State and federal agencies engaged in efforts that culminated in an agreed-upon Consent Decree, filed in 2020 in the Central District of California, which required that the operator pay over $60 million in damages and penalties, and which prescribed terms for any future restart of the pipelines. The Court (Hon. Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, which is a judgment binding all parties.

[9] See 49 U.S.C. § 60105.

33. Plains was also found guilty of a felony and eight misdemeanors for failing to properly maintain these pipelines.

34. The United States and California presented OSFM as the agency that would be responsible for oversight of the Lines CA-324/325, consistent with PHMSA's confirmation of OSFM jurisdiction in 2016.

35. The Consent Decree requires that, prior to restarting Line 901 [now Line CA-324], Plains shall apply for a State Waiver [i.e., state approval to use anti-corrosion measures that differ from the federally required technology, cathodic protection] from the OSFM. The Consent Decree also assigned OSFM the power to approve a restart plan and provided procedures for its modification and termination, as well as for the Court's retention of jurisdiction to enforce compliance with its terms. In its acquisition of Lines CA-324/325, Sable agreed to be bound by the Consent Decree.

36. For more than ten years, Lines CA-324/325 remained idle until March 14, 2026, when Sable restarted Lines CA-324/325 based on the Wright Order.

37. Since Sable acquired the Pipelines in 2024, it has consistently demonstrated that it is willing to cut corners and disregard legal compliance in its crusade to return to production to dig itself out of a financial hole.

38. In February 2024, Sable acquired the Santa Ynez Unit, Las Flores Canyon Processing Facility, and Lines CA-324/325 from ExxonMobil for a total of $625 million dollars, financed almost entirely by a $622 million loan from ExxonMobil.

39. Sable was and remains undercapitalized. As a condition of the acquisition, if Sable did not restart production by January 1, 2026, ExxonMobil had the right of reversion. The maturity date was extended to March 31, 2027, but with a higher interest rate, pursuant to the Second Amendment to Senior Secured Term Loan Agreement.

Complaint for Declaratory and Injunctive Relief

40. Sable's precarious financial position dictated that it prioritize restarting the pipelines quickly, above all else. Shortly after the acquisition, Sable began its venture to restart oil production at the Santa Ynez Unit, transport crude oil through Lines CA-324/325, and sell the oil commercially. In order to do so Sable ultimately opted to repair instead of replace the pipelines. Sable's crews began working on Lines CA-324/325 despite not having received several requisite permits or approvals.

41. By Plaintiff's knowledge and information, there are several active lawsuits to date related to the potential restart. Since early 2025, several state and local entities have issued administrative notices of violation and brought enforcement actions, and actions seeking other forms of relief, against Sable, alleging the company failed to comply with certain requirements of the state framework in performing pipeline maintenance and potential restart, including obtaining applicable property rights.[10] Sable, including its wholly owned subsidiaries, sued California regulators and local authorities for, *inter alia*,

_____

[10] *See Sable Offshore Corp. et al. v. California Coastal Commission*, Case No. 25CV00974 (Santa Barbara Sup. Ct., Apr. 16, 2025) (Coastal Commission cross complained against Sable to enforce administrative fine for unpermitted repair work in the coastal zone); *The People of the State of California v. Sable Offshore Corp.,* Case No. 25-000333 (Santa Barbara Sup. Ct., Sep. 16, 2025)(Santa Barbara County District Attorney brought criminal charges alleging intentional violations of the California Water Code and Fish and Game Code related to the unpermitted repair work); *People of the State of California ex rel. California Regional Water Quality Control Board, Central Coast Region v. Sable Offshore Corp*., Case No. 25CV06285 (Santa Barbara Sup. Ct., Oct. 3, 2025)(alleging violations of the California Water Code involving failure to comply with an investigative order; failure to report waste discharges; and discharge of waste into "waters of the state" without permits); (*Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al.*, Case No. 26CV01759 (Santa Barbara Super. Ct., Mar. 17, 2026) (State Parks alleged trespass by Sable relating to use of the pipeline, including to transport oil through Gaviota State Park without a valid property interest) (removed Mar. 19, 2026 into federal district court as *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al*., C.D.Cal. 2:26-cv-02946).

attempting to implement State law and taking enforcement action regarding Sable's legal violations.[11] Nonprofits have sued challenging OSFM's issuance of State Waivers for alternative anti-corrosion technology for Lines CA-324/325.[12]

42. Importantly, the Santa Barbara County Superior Court issued a preliminary injunction on July 29, 2025, which enjoined Sable from restarting the Pipelines until 10 court days following the filing and service of notice by or on behalf of Sable that Sable has received all necessary approvals and permits for restarting the Pipelines, and that Sable intends to commence such restart. As of the date of this Complaint, that preliminary injunction remains in place—which Sable is now in violation of—despite Sable twice attempting to dissolve it. Nonprofits have also sued the United States Bureau of Oceanic Energy Management and Bureau of Safety and Environmental Enforcement regarding federal leases for the Santa Ynez Unit.[13]

43. On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. On October 22, 2025, OSFM informed Sable that the State

[11] *See Sable Offshore Corp. et al. v. California Coastal Commission,* Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025)(challenging the Coastal Commission's jurisdiction to enforce an administrative penalty); *Sable Offshore Corp. v. Quintero, Case*, No. 2:26-cv-02739 (C.D. Cal., March 13, 2026) ) (seeking declaratory relief related to issue of obtaining easement within Gaviota State Parks); *Sable Offshore Corp. v. CalGEM, et al.,* Case No. 26WM000036 (Sacramento Sup. Ct., February 17, 2026) (challenging CalGEM's bond requirement for production facilities under Public Resources Code section 3205.8 and applicability of SB 1137).

[12] *Environmental Defense Center et al v. California Dep't of Forestry and Fire Protection, Office of the State Fire Marshal et al.,* Case No. 25CV02247 (Santa Barbara Sup. Ct, Apr. 15, 2025) and *Center for Biological Diversity et al v. California Dep't of Forestry and Fire Protection, Office of the State Fire Marshal et al*., Case No. 25CV02244 (Santa Barbara Sup. Ct, Apr. 15, 2025).

[13] *Center for Biological Diversity et al. v. Doug Burgum et al.,* Case No. 2:25-cv-02840, (C.D. Cal, Apr. 2, 2025); *Center for Biological Diversity et al v. Debra Haaland et al*., Case No. 2:24-cv-05459 (C.D. Cal, June 27, 2024).

Waivers required Sable to, before any restart, repair metal loss anomalies detected during in-line inspections and declined to approve the restart plan at that time.

44.   Rather than coming into compliance with the State Waiver requirements, on November 26, 2025, Sable instead petitioned PHMSA to step in and unilaterally assume jurisdiction over the Pipelines. Sable's letter to PHMSA "notif[ied]" the agency of *Sable's* determination that the pipelines were interstate— a determination that PHMSA must make, and one counter to PHMSA's longstanding determination —and asked that PHMSA assume exclusive authority over the pipelines by redesignating them as interstate under the Pipeline Safety Act, 49 U.S.C. § 60100 et seq.

45.   On December 17, 2025, PHMSA adopted Sable's determination. The agency issued an order redesignating the Pipelines as *inter*state, purporting to strip OSFM of its authority to regulate the *intra*state pipelines, and declaring the Pipelines under PHMSA's "exclusive regulatory authority" (Federalization Order).

46.   On December 22, 2025, PHMSA issued a one-page letter approving Sable's Restart Plan for the Pipelines.

47.   On December 23, 2025, PMHSA issued an Emergency Special Permit to Sable, waiving compliance from certain requirements related to remediation of corrosion in the pipeline wall. PHMSA also stated that the granting of the Emergency Special Permit was necessary to address the energy emergency declared in Executive Order 14156, *Declaring a National Energy Emergency*. 90 Fed. Reg. 8433 (Jan. 20, 2025).

48.   On January 23, 2026, California filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's Federalization Order, PHMSA's approval of the restart plan, and the emergency special permit.[14]

---

[14] *State of Calif. v. PHMSA et al.*, No. 25-508, consolidated with *Env'tl Def. Ctr. v. PHMSA*, No. 25-8059 (9th Cir.).

49.   On February 26, 2026, Sable announced that it was abandoning its State Waivers, citing PHMSA's Federalization Order as the basis.

50.   Sable's restart of the Pipelines, absent the requisite permits and compliance with state and federal law, is an affront not only to California's police powers, but also the proper and safe regulation of the Pipelines. Furthermore, Sable's loan indebtedness and pressure to restart before its assets revert to ExxonMobil, give the company an incentive to prioritize its own financial solvency over the safety and compliance of its project. Sable's desire to circumvent the law is not only borne out by its actions, but plainly evidenced by two letters requesting that federal regulators, first PHMSA and now DOE, help the company restart in circumvention of California law and court orders. Defendants' unprecedented act of government assistance to a single struggling oil company endangers the health and safety of California's residents and the environment.

**III.    The Wright Order was Issued at Sable's Request to Restart the Pipelines by Bypassing State and Federal Law, Including Two Judicial Orders**

51.   On December 12, 2025, Sable sent a letter to DOE requesting that it act under the DPA to authorize and order the restart of the Pipelines.[15]

52.   On March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel issued an opinion entitled *Preemptive Effect of Defense Production Act Order on State Law* (OLC Opinion). 50 Op. O.L.C. __ (Mar. 3, 2026). At DOE's request, the OLC Opinion addressed whether an order issued under the DPA to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline

---

[15] 50 Op. O.L.C __ (March 3, 2026) Slip Op. at 3, citing to a Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act at 1 (Dec. 12, 2025).

15        Complaint for Declaratory and Injunctive Relief

infrastructure."[16] The OLC Opinion concluded that an "order issued under [the DPA] could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through the Pipelines] with [OSFM]."[17]

53.    Shortly thereafter, on March 13, 2026, President Trump issued an Executive Order (EO) titled, *Adjusting Certain Delegations Under the Defense Production Act*.[18] The EO amended previous Executive Order 13603 (National Defense Resources Preparedness) of March 2012, which delegates certain authorities of the President under the DPA to specified Executive department and agency heads, by adding the Secretary of Energy.

54.    That same day, the Wright Order was issued pursuant to Title I of the DPA.[19] Specifically, the Wright Order directs Sable to:

> . . . [I]mmediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities at Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.
>
> . . . [I]mmediately commence performance under current contracts or orders for services, including contracts or order hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal;
>
> . . . .
>
> . . . [C]omply with this order immediately and to maintain that compliance until such time as the conditions

---

[16] *Id.* at 1.

[17] *Id.* at 22.

[18] https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-underthe-defense-production-act/

[19] DPA § 4511; The Order was issued pursuant to the delegation of authority conferred on the Secretary by Executive Order 13603.

necessitating the issuance of this order abate or until Sable is directed otherwise.[20]

55.    The Wright Order restates Sable's claims that "the State of California is impeding it from resuming transportation of Santa Ynez Unit production through the SYPS" and that "California agencies have deployed an array of state measures—including [California Senate Bill No. 237 (2025), setting stricter conditions on restart of pipelines that have been idle, inactive or out of service for five years or more], the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[21]

56.    On March 14, 2026, one day after the Wright Order was issued, Sable restarted the Pipelines, in direct violation of the Consent Decree - which it is bound by - the preliminary injunction in the Santa Barbara County Superior Court, and all state and federal laws governing the restart.

57.    Sable immediately issued a press release and announced it "immediately complied" with the DPA Order and restarted pumping through the CA Lines 324/325 *at the direction of the United States Secretary of Energy, Chris Wright*.[22]

58.    The DOE issued a press release and several statements confirming that Secretary Wright issued an order under the DPA directing Sable to immediately "restore the Santa Ynez Unit and Pipeline."

59.    On March 17, 2026, Sable sent a letter to the U.S. Department of Justice and the California Department of Justice, also stating it had "complied with Order"

---

[20] Wright Order at 3.

[21] *Id*. at 2.

[22] https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx (emphasis added).

and restarted the Pipelines, and that it was no longer going to abide by the Consent Decree.[23]

## IV.     Secretary Wright Orders the Immediate Restart of the Pipelines in Direct Contravention of the DPA and its Regulations.

60.    Secretary Wright issued the Wright Order pursuant to the DPA's Title I prioritization and allocation authority that permits orders that compel the performance of government contracts with industry necessary to promote the national defense with respect to energy.[24]

61.    This authority gives the Secretary the power to require industry contractors to perform some orders before others or to allocate already-available resources to some orders before others.[25]

62.    Notably, the DPA's Title I regulations establish a "Department of Energy Priorities and Allocations Program" specifically for regulating the prioritization and allocation of government contracts with industry.[26]

63.    These Title I contracts are called "requirements contract," "basic ordering agreement," "prime vendor contract," or "similar procurement document . . ."[27]

64.    The DPA regulations assign levels of priority to contracts based on a rating system that rates a contract as "DO" or "DX" or "unrated."[28] DX rated orders are prioritized over DO orders, and DO orders are prioritized over unrated orders.

65.    Any contracting decisions made under this system must be made with a "strong preference" for small businesses, especially those in economically depressed areas.[29] Sable is not a small business.

---

[23] Letter from Anthony C. Duenner, Executive Vice President, General Counsel and Secretary, Sable Offshore Corp., March 17, 2026.
[24] DPA § 4511 A.
[25] 50 U.S.C. § 4511(a), (c).
[26] 10 C.F.R. § 217.3.
[27] 10 C.F.R. § 217.32
[28] 10 C.F.R. § 217.31
[29] 10 C.F.R. § 216

66.    Notably, the DPA's Title I regulations require that these contracts include a specific delivery date. The word "immediately," as used in the Wright Order to authorize the restart, does not constitute a delivery date as required.[30]

67.    However, the Wright Order does not say, and no public information indicates, that Sable holds a Title I government contract or that Sable is required to sell its crude to the government in a Title 1 contract. The Wright Order also fails to state where, or to whom, Sable will sell the crude oil it produces.

68.    It is simply inexplicable and unclear how the Secretary purports to utilize the DPA's Title I authority to direct the wholesale and "immediate" restart of the pipelines in the absence of any required Title I contracts, orders, or allocations.

69.    The Secretary's use of the DPA's Title I authority to order the immediate restart of the pipelines out of the context of ordering the performance of a government contract or allocation order is incongruent with the statute and regulations that support the DPA's Title I power and amounts to an unprecedented abuse of power by the Secretary, and the order is contrary to law and arbitrary and capricious.

70.    Even if Sable applied for or obtained a Title I government contract to supply its oil to the government, the Wright Order is still be invalid because it fails to meet the threshold findings requirements of Title I.

71.    The DPA only authorizes the Secretary to require priority performance of contracts or allocation orders for domestic energy if two key findings are made.

72.    First, he must find that the covered "materials, services, and facilities are *scarce, critical, and essential*—(i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities[.]" (Emphasis added.)

73.    Second, he must determine that the "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies

---

[30] 10 C.F.R. § 217.32

Complaint for Declaratory and Injunctive Relief

or the construction and maintenance of energy facilities *cannot reasonably be accomplished* without exercising the authority specified in paragraph (1) of this subsection."[31] (Emphasis added.)

74. The law governing agency actions requires that these findings must be more than mere declarations, but rather, supported by sound reasoning that supports the choice made.

75. The Wright Order declares that the offshore Santa Ynez Unit oil field is a "critical energy resource on the West Coast" and the largest offshore oilfield, but fails to provide necessary information to support this determination, fails to make the required findings, and fails to consider all aspects of the problem with restarting the pipelines.

76. For example, there is no information provided that describes the quantity or quality of oil or the cost of extraction on the environment or community. Nor is there an identification of other energy sources or a comparison to other possible energy sources that might provide more energy independence with fewer impacts, such as a renewable energy source. The Secretary failed to explain why the DOE chose to favor Sable's oil project above all others.

77. The Order also fails to discuss the impact of another oil spill on California's economy.

78. The impacts of the 2015 oil spill—which caused hundreds of millions of dollars of damage to California's natural resources and economy—coupled with the ongoing safety issues, are another vital piece of the problems surrounding Sable's restart that were ignored in the Wright Order.

79. The Wright Order also does not attempt to articulate why the pipelines, in particular, are critical to the national defense. The Wright Order also does not allege that Sable is part of a national energy program or a national defense program.

---

[31] DPA § 4511(c).

20          Complaint for Declaratory and Injunctive Relief

80. The Wright Order cites the *Declaring a National Energy Emergency* Executive Order (Executive Order 14156), which is currently being challenged in federal court.[32]

81. The United States already produces significantly more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[33]

82. The Wright Order also fails to provide any rational basis that connects how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense with respect to energy.

83. The Secretary fails to rationally explain why the Wright Order only favors Sable, nor does it provide any credible information to support the restart of Sable's pipeline in a manner that is "immediate" and circumvents state and federal law, as well as existing court orders.

## V. The Wright Order Impermissibly Tries to Displace a Robust, Coordinated Apparatus of State Law and Attempts to Usurp State Agency Jurisdiction.

84. In the three-page Wright Order, Secretary Wright gave Sable a convenient escape from compliance with state pipeline regulation and

---

[32] *State of Washington, et al. v. Donald Trump, et al.*, Case No. 2:25-cv-00869 (U.S.D.C. Western Dist. of WA).

[33] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024). Available at https://www.eia.gov/todayinenergy/detail.php?id=61683.

U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), Available at https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a.

U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), Available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php; U.S. Energy Independence Set New Record In 2023

environmental, and land use laws that it, in multiple instances to date, has failed to comply with. This attempts to make inapplicable the comprehensive state regulatory framework governing the restart. Secretary Wright's use of the DPA to broadly authorize preemption of state law in the Wright Order is contrived, in direct conflict with the statute, and without lawful and reasoned explanation.

85. The California regulatory framework governing the restart vests authority in eight different state agency regulators, who play crucial and interrelated roles in regulating the Pipelines restart. The state scheme is critical for California's safety.

86. A variety of state laws apply to the restart. First, two California state laws and regulations govern pipeline safety and oil spill response.

87. The Elder California Pipeline Safety Act of 1981, Cal. Gov. Code § 51010 et seq., applies to public safety, risk reduction, and spill prevention of hazardous liquid pipelines within California. OSFM implements the law.

88. The Lempert-Keene-Seastrand Act of 1990, Cal. Gov. Code section §§ 8574.1 et seq., applies to oil spill prevention, preparedness and response. The Office of Spill Prevention and Response, within the California Department of Fish and Wildlife, implements the law.

89. Second, California state laws and regulations govern the restart's impacts to water quality.

90. The Porter-Cologne Water Quality Control Act of 1969, Cal. Wat. Code, § 13000 et seq., applies to the discharge of waste, stormwater, and land disturbances that could occur during pipeline repair or construction. The California State and Regional Water Quality Control Boards implement the law.

91. Third, California state laws and regulations govern the restart's impacts to wildlife and habitats.

92. The California Endangered Species Act of 1984, Cal. Fish & Game Code, § 2050 et seq., applies to the management and protection of listed species. And section 1602 of the California Fish and Game Code requires a lake or

streambed alteration permit if the pipeline's onshore activities may substantially adversely impact fish and wildlife. The California Department of Fish and Wildlife implements these laws.

93.  Fourth, California state laws and regulations govern activity and development in the coastal zone. The California Coastal Act of 1976, Public Resources Code §§ 30000 et seq., regulates development in the "coastal zone."[34]

94.  Senate Bill 237 (SB 237), which became effective January 1, 2026, amended the California Coastal Act and requires that a new coastal development permit be obtained for the repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more and is located in the coastal zone, such as the pipelines. Cal. Pub. Res. Code § 30262. The California Coastal Commission implements these laws.

95.  Fifth, California state laws and regulations apply to certain oil and gas production facilities, including the Las Flores Canyon Processing Facility.

96.  Section 3106 of the California Public Resources Code ensures that operators carry out oil and gas production, operation, and decommissioning of "production" facilities in a manner that prevents damage to the health and safety of California's citizens, or damage to the environment and natural resources. The California Department of Conservation, Geologic Energy Management Division (CalGEM) implements the law.

97.  Furthermore, the pipelines cross state land and are subject to state property law. The State's lands are administered and managed by several state agencies.

98.  The California State Lands Commission issues and manages leases for existing oil and gas operations in State waters. The California State Lands Commission currently holds two of Sable's undersea pipelines leases, one for oil and one for natural gas, that together connect the Santa Ynez Unit offshore

---

[34] Cal. Pub. Res. Code, § 30103.

platforms to the Santa Ynez Pipeline System and onshore Las Flores Canyon Facilities.

99. California Department of Parks and Recreation (State Parks) may grant easements for oil or gas pipelines on property that it owns.[35] Because the onshore pipelines cross approximately four miles of Gaviota State Park, which is owned by State Parks, Sable must obtain an easement from State Parks to run its oil across state land.

100. Sable does not currently have any easement rights or other property rights that allow it to transport oil through Gaviota State Park.

101. In 1987, State Parks granted an easement to Sable's predecessor-in-interest, Celeron Pipeline Company of California, to transport hydrocarbon substances through the segment of Line CA-325 (then Line 903) that crossed Gaviota State Park. This easement was for a term of 30 years. It began on July 28, 1986, and expired on July 27, 2016.

102. Since 2016, State Parks has issued annual Right of Entry (ROE) permits to Sable's predecessors-in-interest or companies affiliated with Sable that have allowed them to access Gaviota State Park in order to perform maintenance on the then-dormant Line CA-325.

103. The ROE permits are not easements. Sable does not currently have any easement rights or other property rights that would allow it to transport oil through Gaviota State Park. The ROEs are necessary because Sable does not have an easement that would otherwise allow it to access the Park.

104. To the extent the Wright Order directs Sable to trespass on state land by operating without an easement, the Order infringes on state property rights and is unconstitutional.

105. In the days following Sable's March 14, 2026 restart announcement, State Parks, the State Lands Commission and the California Coastal Commission

---

[35] Cal. Pub. Res. Code § 5012.

issued letters to Sable seeking confirmation from that company that it would adhere to state law obligations. State Parks received no responses to its letter.

106. Through these state agencies, the State of California carefully exercises its police powers to protect the public health and welfare as required by the Legislature of the State of California through its duly enacted laws. The DPA does not authorize the Secretary to issue an order that preempts California's laws.

### VI. Defendants Impermissibly Wield Executive Power to Abrogate Federal Law and Judicial Orders

107. The Wright Order, if allowed to stand, purports to subvert a vast array of long-standing federal laws, a federal judicial Consent Decree, and a state preliminary injunction that put conditions on any restart of the Pipelines. The DPA contains no provision that allows it to direct Sable to circumvent federal law, the Consent Decree that arose from the devastating Refugio Oil Spill and pipeline safety problems from the Pipelines, or the state court's preliminary injunction. While actions to enforce the Consent Decree and preliminary injunction are pending in the courts that issued those orders—and thus the State does not ask this Court to enforce those orders itself against nonparty Sable—the Wright Order's suggestion that it could upend those judicial orders is infirm and should be invalidated.

108. In addition to California's regulatory framework governing the safe and secure production of oil from Sable's pipelines, there are several federal statutes that are not preempted by the DPA, such as the Pipeline Safety Act, the Submerged Lands Act, and the Coastal Zone Management Act.

109. Furthermore, the Consent Decree and preliminary injunction are judicial orders that Sable must comply with, and the Wright Order cannot modify or abridge them.

110. Sable has not met the conditions for restart. The DPA does not authorize the Secretary to use a Title I DPA Order to sidestep Judicial Orders and require

25        Complaint for Declaratory and Injunctive Relief

Sable to restart "immediately" in violation of the Consent Decree and preliminary injunction.

## VII.    Defendants' Actions Harm California

111. Without this Court's intervention, the Wright Order voids state laws, resulting in harms to California.

112. The Wright Order is an affront to, and usurpation of, the traditional police powers delegated to the states, in that it seeks to override any and all California laws that stand in the way of the restart of the Pipelines. The Wright Order also tramples over California's property rights to the extent it purports to allow Sable to operate Line CA-325 through a state park without an easement—or the safety and environmental conditions the Department of Parks and Recreation previously imposed under a now-expired easement—and to operate the Offshore Pipeline through leases from the California State Lands Commission without abiding by lease terms, including those mandating compliance with all other state laws.

113. Without cathodic protection or the safe alternative required by the State Waivers, there is also increased risk of oil spills in pipelines.

115. Spills resulting from restarting the pipelines under a handcuffed state regulatory framework would have serious environmental impacts across multiple categories, including water quality safety, coastal protection, and species protection.

116. Given the devastating impact of the Refugio Oil Spill and Sable's numerous pipeline safety violations, Sable's unlawful restart poses significant risks to California's economy, natural resources, and communities' health, safety, and welfare.

**CAUSES OF ACTION**
**COUNT I**
**Violations of Administrative Procedure Act, § 706(2)(B)-(C)**
**Contrary to Law, In Excess of Statutory Authority**

117.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

118.    An agency may not take any action that exceeds the scope of its statutory authority or violates federal law.

119.    The Wright Order is an agency action subject to the APA. 5 U.S.C. § 551.

120.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

121.    Defendants may only exercise authority conferred by statute.

122.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not amount to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

123.    Defendants have no authority under the DPA to immunize Sable from compliance with state and federal laws and Court Orders, including the Consent Decree and preliminary injunction. There is no express nor implied authority in the

DPA to preempt all relevant state and federal laws governing the restart. If allowed to stand, this illegal assertion of authority to displace a broad regulatory framework could have wide-ranging applications and extend beyond judicially enforceable limits.

124.   In addition, to the extent the Wright Order purports to preempt Plaintiff's right to own, manage, and dispose of its own land in Gaviota State Park, Defendants have no authority for such preemption absent a clear congressional judgment. See, e.g., *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993). Defendants unlawfully claim power beyond what Congress intended when it enacted the DPA.

125.   The Wright Order is contrary to requirements for contract prioritizations and allocation orders codified in the statute and regulations, which specifically apply to government contracts and government contractors, conditions that are not applicable here.

126.   The Wright Order is contrary to Title I's required specificity in description of contract prioritizations and allocations. The Wright Order lacks specificity as to any Title I contracts, orders, or allocations that Sable must enter into. The Wright Order fails to state where, or to whom, Sable will sell its crude from the pipelines.

127.   The Wright Order does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by 10 C.F.R. § 217.

128.  Even if the Wright Order otherwise complied with the DPA, it would not have the sweeping preemptive scope that Defendants claim. Nothing in the

DPA purports to preempt all state laws and regulations that affect or apply to contracts governed by the DPA.

129.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants lack legal authority under the DPA and its implementing regulations in enacting the Wright Order, and, in so doing, acted contrary to law and in violation of the APA.

130.    Plaintiff is also entitled vacatur of the Wright Order pursuant to 5 U.S.C. § 706.

## COUNT II
### Violation of Administrative Procedure Act 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

131.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

132.    Defendants are included as "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Wright Order is agency action subject to review under the APA.

133.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

137. The Wright Order provides no reasoned basis and fails to explain why and how the restart of oil production and transportation from the Santa Ynez Unit through the Offshore and Lines CA-324/325 is necessary to "promote the national defense" and address purported domestic energy shortages. Relatedly, the national defense rationale is pretextual, not a valid justification.

135. The Wright Order failed to consider important aspects of the problem, such as the fact that immediately restarting transportation of crude oil through the pipelines would violate state and federal law and Court Orders.

136. Further, the Wright Order contains no reasoning as to the impact it would have, if allowed to stand, on California's state regulatory framework.

137. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Wright Order violates the APA because it is arbitrary and capricious.

138. Plaintiff is also entitled to vacatur of the Wright Order pursuant to 5 U.S.C. § 706.

**COUNT III**
**Violation of the U.S. Constitution**
**Separation of Powers**

139. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

140. Article III, Section 1 of the United States Constitution vests the judicial Power of the United States in federal courts. U.S. Const., art. III, Sec. 1.

141. It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 76–81 (1982).

142. The Constitution identifies specific roles for the Executive in the lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates the President's veto power; outside these roles, the Executive Branch

has no authority to change the law to suit the President's policy. U.S. Const. art. II, § 3; *id.* § 7, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

143. Congress cannot vest review of Article III court decisions in Executive Branch officials, and, by extension, the legislative and Executive Branches cannot unilaterally override judicial determinations. Separation of powers principles protect judicial independence by ensuring that once a court renders a decision, it cannot be subject to Executive revision or nullification.

144. Congress also possesses the power to legislate. Article I, Section 1 of the U.S. Constitution states "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives. U.S. Const., art. I, § 1.

145. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

146. With the Wright Order, Defendants attempt to usurp the judiciary's authority to modify or reverse judicial judgments in direct violation of the separation of powers. The Executive Branch's attempt to overrule the careful judgements of the Judicial branch by ordering Sable to restart is in direct contravention of the Consent Decree and the preliminary injunction, both judicial orders. Because the Consent Decree is an exercise of this court's Article III power, only an Article III court can modify or retract it.

147. Defendants violated constitutional separation of powers constraints because, through the Wright Order, Defendants claim to have overridden Congress's considered judgments by attempting to broadly preempt state law, when the text of the DPA does not empower Defendants to do so.

148. Further, Defendants impermissibly attempt to substitute the President's policy priorities for the will of Congress in enacting the DPA.

149. Plaintiff is aggrieved persons suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702.

150. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Wright Order violates the constitutional principles of separation of powers doctrine and impermissibly arrogates to the Executive Branch power that is reserved to the Judicial branch.

## COUNT IV
### Violation of the Tenth Amendment to the U.S. Constitution
### Sovereign Interests

151. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

152. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend X.

153. Each state as a sovereign has reserved power to own, manage, and dispose of its property, including state parkland.

154. To the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Order infringes upon California's sovereign power to own, manage, and dispose of its property.

155. Defendants have no authority under the DPA to infringe upon or preempt California's sovereign power to own, manage, and dispose of its property. A state's power to own, manage, and dispose of its property is not subject to preemption absent a clear congressional judgment. *See, e.g., Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of*

*Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993); *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017).

156. And the federal government has no constitutional power to commandeer state property for federal ends in violation of the Tenth Amendment, including by compelling the state to give a private company free use of that property in potential violation of the State's own constitutional prohibition on gifting public funds or things of value to private parties (Cal. Const., Art. XVI, section 6).

157. If Congress intends to override a state's right to own, manage, and dispose of its own property, it must speak clearly as to such intention, which it has not done in the DPA.

158. Plaintiff is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702.

159. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that, to the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Wright Order violates the Tenth Amendment to the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

1. Issue a judicial declaration that the Wright Order is unconstitutional and/or unlawful because it violates the APA and the U.S. Constitution;

2. Vacate the Wright Order pursuant to 5 U.S.C. § 706;

3. Enjoin Defendants from invoking the Wright Order to authorize or compel operation of the Santa Ynez Unit and the pipelines, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the

33        Complaint for Declaratory and Injunctive Relief

pipelines without having received necessary state-law approvals and without satisfying the terms of court orders;

4. Grant other such relief as this Court may deem proper.


Dated: March 23, 2026                          Respectfully submitted,

                                               ROB BONTA
                                               Attorney General of California
                                               DEBORAH M. SMITH
                                               Acting Senior Assistant Attorney
                                               General
                                               ALICIA ROESSLER
                                               REBECCA HUNTER
                                               Deputy Attorneys General


                                               DENNIS L. BECK, JR.
                                               Supervising Deputy Attorney General
                                               *Attorneys for Plaintiff State of
                                               California*